[Cite as *State v. Oller*, 2017-Ohio-814.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 16AP-429 |
| v. | : | (C.P.C. No. 15CR-1953) |
| Timothy M. Oller, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 7, 2017

**On brief:** *Ron O'Brien,* Prosecuting Attorney*, and Sheryl L. Prichard,* for appellee*.*

**On brief:** *Carpenter Lipps & Leland LLP*, *Kort W. Gatterdam*, and *Erik P. Henry* for appellant.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Timothy M. Oller[1], appeals a judgment of the Franklin County Court of Common Pleas entered May 17, 2016, sentencing him to serve 21 years in prison. The sentence resulted from a criminal trial whereby a jury found him guilty of a single count of involuntary manslaughter after making the specific finding that Timothy acted under provocation. On conviction and sentencing, the trial court judge stated on the record that he rejected the jury's finding that Timothy had acted under provocation and stated that his acts resulting in Davis' death were calculated. As part of sentencing, the trial court judge found Timothy to be a repeat violent offender under R.C. 2941.149. Because we agree that the trial court erred by rejecting the jury's finding that Timothy acted while under provocation in order to justify the sentence the trial court imposed, we

---

[1] Because Timothy Oller's brother, Robert, is an important character in the events underlying this case, we shall use Timothy and Robert's first names in order to avoid confusion. No informality is intended.

No. 16AP-429

reverse and remand for a new sentencing hearing with the instruction that the trial court must accept the factual findings of the jury and proceed to sentence from that basis. We also instruct that if, on resentencing, the trial court again imposes a period of imprisonment as a consequence of the repeat-violent-offender specification, the trial court must state such findings on the record as required by R.C. 2953.08(G)(1) and 2929.14(B)(2)(e). Because we find no basis on which to sustain any of Timothy's other six assignments of error or related subparts, we otherwise affirm.

## I. FACTS AND PROCEDURAL HISTORY

### A. Facts as Presented at Trial

{¶ 2} On April 12, 2015, Timothy fatally stabbed Monica Davis near a small grocery store, Wheatland Foods. The store is located on the northeast corner of the intersection of Graham Street and Mt. Vernon Avenue in Columbus, Ohio, and the stabbing itself took place just north of the store on the east side of Graham Street. As a result, Timothy was indicted on April 21, 2015 for one count of murder and one count of felony murder with felonious assault as the underlying predicate offense. (Apr. 21, 2015 Indictment.)

{¶ 3} The stabbing and events leading up to it were captured on a police camera. Thus, after only a short interval for investigation and preparation, on May 2, 2015 a jury trial commenced. The video (which lacks sound but clearly shows the events) was played at trial and the parties stipulated to the location, date, time, and identities of the persons depicted in the video. (May 3, 2016 Tr. Vol. II at 63-64, filed on July 18, 2016; State's Ex. A.)

{¶ 4} The video shows that shortly before 5 p.m. Timothy and his brother, Robert Oller, approached Wheatland Foods and entered the store. (State's Ex. A at 24:24-24:35.) Davis, who had been loitering in the vicinity of the store for some period of time, entered the store approximately three minutes after the Oller brothers. *Id.* at 26:34-26:38. Less than one minute later, all three emerged, Davis arguing with Timothy and pushing him. *Id.* at 27:02-27:35. A group gathered and Timothy was briefly surrounded. *See e.g., id.* at 28:20. Davis mimed pelvic thrusting several times, once against a bicycle, once in the air, and once against a phone booth, and pointed repeatedly to Timothy. *Id.* at 29:15-29:38. However, within approximately five minutes the situation appeared to have been mostly

No. 16AP-429

resolved; Davis and Timothy shook hands, and the Oller brothers left as the owner of Wheatland Foods attempted to calm down Davis. *Id.* at 28:54-59, 30:10.

{¶ 5} A few minutes after the Oller brothers departed, a police officer, Sergeant Douglas Wilkinson, stopped his cruiser on seeing Davis' apparent irate state and had a conversation with Davis. *Id.* at 31:20-36:16. Wilkinson would later testify that Davis said someone had touched her inappropriately but that she did not want to do anything about it because the person had apologized. (Tr. at 130-33.) Wilkinson also would later testify that Davis was intoxicated. (Tr. at 137.)

{¶ 6} Approximately 17 minutes after the end of the first interaction, the Oller brothers returned to the store. (State's Ex. A at 47:45-47:50.) After entering and then leaving the store, the brothers began to depart from the area, but then apparently changed their minds and instead loitered, drinking while leaning against the side of the store facing Graham Street. *Id.* at 50:10-50:24. Approximately 15 seconds after the brothers began drinking while leaning against the side of the store, Davis returned to the store, peered around the side of the building, and initiated a conversation. *Id.* at 50:40-50. During this conversation, Paul Jones (a young man with a thick cane held over his shoulder like a club) approached and loitered nearby. *Id.* at 50:46-51:00. Almost simultaneously, another person from the neighborhood, Renee Wiley, drew near and was flagged down by a gesticulating Davis who pointed repeatedly at the Oller brothers while talking with Wiley. *Id.* at 51:00-51:11. Wiley then began a close conversation with the brothers, gesturing quickly and repeatedly as she spoke. *Id.* at 51:12-52:45. This conversation escalated into Wiley attempting to strike both brothers as the shopkeeper of Wheatland Foods restrained her and attempted to insert himself between Wiley and the brothers. *Id.*

{¶ 7} At this juncture, another neighbor, Ethni Smith, arrived and began gesturing expansively as the shopkeeper attempted to hustle the brothers away down Graham Street. *Id.* at 52:43-53:07. However the brothers, led by Timothy, turned back and when Smith and Davis rounded the corner again to continue the argument, Timothy exposed his waistband to reveal that he carried a knife. *Id.* at 53:07-17. After more words and gestures from both Smith and the shopkeeper to encourage the various gathered persons to disperse, the Oller brothers turned to leave. *Id.* at 53:17-53:38. They began

No. 16AP-429

walking down the east side of Graham Street while Davis crossed to the west side of Graham Street and left the frame of the video.  *Id.* at 53:36-48.

{¶ 8}  After approximately ten seconds, Davis reentered the frame of the video from the west side of Graham Street and made straight for the two brothers who were then still on the east side of Graham Street.  *Id.* at 53:55-53:58.  As Davis approached, Robert stepped off the curb and met Davis in the middle of the street while Timothy remained on the sidewalk on the east side.  *Id.* at 53:54-54:02.  When Davis met Robert in the middle of the street she punched him twice after reputedly proclaiming, "I'm going to beat your ass," or something to the effect that she was going to "fuck him up."  *Id.* at 54:02-06; May 5, 2016 Tr. Vol. IV at 292, 309-10, 326.  Then she turned to Timothy, who was still on the sidewalk.  *Id.* at 54:06-54:10.  She approached him and punched him in the side of the head, shoved him, and then turned to Robert again.  *Id.*  When Davis turned toward Robert again, Timothy ran up behind her and stabbed her in the right side.  *Id.* at 54:10-13.  Davis clutched her side, teetered for approximately 13 seconds and then fell face-first onto the sidewalk.  *Id.* at 54:13-26.  Timothy attempted to flee as neighbors converged but they caught him and stomped him to unconsciousness before laying him against a telephone pole where the police found and arrested him minutes later.  *Id.* at 54:12-56:34, 57:38-107:02.

{¶ 9}  At trial, a deputy coroner testified that Davis died from a seven-inch-deep stab wound in the right side of her lower back.  (Tr. Vol. II at 68, 75-76, 78-79.)  According to the coroner, the knife only stopped penetrating when it hit her second lumbar vertebra.  (Tr. Vol. II at 78.)  The wound injured her organs and vessels including the aorta and inferior vena cava with the result that she bled to death.  (Tr. Vol. II at 68, 75-76, 78-79.)  The parties stipulated that Davis' DNA was present on a long kitchen knife discovered at the scene.  (Tr. Vol. IV at 268.)  The deputy coroner also testified that Davis had cocaine and cocaine metabolites in her system and tests revealed a 0.15 percent blood alcohol concentration, more than double the legal driving limit.  (Tr. Vol. II at 83-84.)

{¶ 10} Ethni Smith testified that she did not see Davis with any weapon but that Timothy had an old butcher knife with a wooden handle and a long rusted blade.  (Tr. Vol. II at 112, 115-16.)  She testified that Robert encouraged Timothy, but admitted that initially she falsely told the police that Robert had held Davis while Timothy stabbed her.

No. 16AP-429

(Tr. Vol. II at 122-23.) She also related that all of the participants in the affray were under the influence. (Tr. Vol. II at 125.)

{¶ 11} Renee Wiley also testified that she did not see Davis with a weapon. (May 4, 2016 Tr. Vol. III at 197-98.) Wiley alleged that the Oller brothers were trying to fight everyone and stir up trouble. (Tr. Vol. III at 191-94.) She also testified that she had known Davis since they were 12-years-old and that Davis was like family to her. (Tr. Vol. III at 187.) She admitted having a felony conviction for receiving stolen property and that on the day of the stabbing she had been drinking beer and using crack cocaine. (Tr. Vol. III at 186, 188-89.)

{¶ 12} The jury also heard recorded statements from Timothy. The first was a video taken from inside the cruiser shortly after his arrest in which he made a number of unsolicited statements as follows:

> Think because you're in their neighborhood they think they can, like, tell you what to do. Uhh, no. You might die fuckin with me.
>
> You done ran into the wrong honkey. I'll end this bitch.
>
> You possibly could be dead fuckin with me. Uh, yeah.
>
> I'll put your ass in a body bag, bitch!
>
> I doan give a fuck!

(State's Ex. F at 0:00-0:13, 0:14-0:18, 0:24-0:27, 30-33; Tr. Vol. III at 223). Then Timothy inquired of the officer seated in the front seat:

> Sir, that lady that got stabbed, whoever did . . . . What happened to her? Huh? She okay? Huh?

*Id.* at 0:58-1:10. His speech is very slurred during the video.

{¶ 13} The second occasion on which the jury heard from Timothy was when a video of his interview at the police station was played. (Tr. Vol. III at 243; State's Ex. G.) As is true in the cruiser video, his speech is noticeably slurred in the interview video and the interviewing officer testified at trial that Timothy appeared intoxicated. (Tr. Vol. III at 247-48.) During the interview, Timothy's statements were frequently incoherent but he

No. 16AP-429

claimed to have been defending himself and denied knowledge of any knife. (State's Ex. G, in passim.)

{¶ 14} Finally, the jury heard from Timothy when he testified at trial. He admitted that he had previously been convicted of a variety of felonies. (Tr. Vol. IV at 272.) He then explained that on April 12, 2015 he lived a block and a half from Wheatland Foods and had just moved in about ten days prior to the incident. (Tr. Vol. IV at 273.) He said when he entered Wheatland Foods, Davis wrapped her leg around him provocatively and said something along the lines of, "[y]ou think you're something. What you got for me?" (Tr. Vol. IV at 278.) He testified that he pushed by her, which involved physical contact, but he denied any inappropriate touching. (Tr. Vol. IV at 278-79.) When Timothy did not engage her advances, Davis began to loudly claim to anyone who would listen that Timothy had touched her provocatively. (Tr. Vol. IV at 279-80.) This drew the crowd that appeared on the video but the store owner mediated and convinced the individuals who gathered to permit the Oller brothers to leave. (Tr. Vol. IV at 280-83.)

{¶ 15} Timothy testified that he and his brother later returned to the store because he decided he wanted a cigar wrap in which to smoke marijuana. (Tr. Vol. IV at 284-86.) On the way to the store he found a knife lying in the grass and decided to pick it up in case he needed some protection. (Tr. Vol. IV at 286.) Timothy testified that when Davis began speaking to them on the second visit to the store she again began repeating the false allegations about the inappropriate touching and soon had other people, including Jones and Wiley, threatening to do bodily harm to both Oller brothers. (Tr. Vol. IV at 289.) According to Timothy, he did not immediately depart because he was worried what might happen once he and his brother were out of range of the police camera. (Tr. Vol. IV at 291.) He flashed the knife to Smith who was trying to mediate the situation in order to convince her that they should be permitted to leave and deter potential aggressors from following. (Tr. Vol. IV at 291-92.)

{¶ 16} After flashing the knife, he and his brother departed while Davis crossed the street and approached the porch of an apartment on the other side of the street. (Tr. Vol. IV at 292-93.) Then she turned back and crossed the street, moving toward his brother saying that she was going to "fuck him up." *Id.* She hit his brother and then hit Timothy, splitting his ear. (Tr. Vol. IV at 293-94.) He thought perhaps she had a weapon because

No. 16AP-429

she went to the apartment across the street and then immediately returned and attacked the two of them. (Tr. Vol. IV at 293.)  He also said he was angry, "about as angry as you can get," because he had been falsely accused of groping her and had been physically attacked.  (Tr. Vol. IV at 294.)  So he stabbed her.  (Tr. Vol. IV at 293.)  He testified that he did not intend to kill, that using the knife was an angry reaction, and also done from fear that she may have had a weapon. (Tr. Vol. IV at 293-95.)  But he admitted he made a choice to stab rather than slash and that his thought that Davis may have had a weapon was speculation.  (Tr. Vol. IV at 315, 317.)  He told the jury that he regretted what he did, "[m]ore than anybody would ever know."  (Tr. Vol. IV at 327.)

## B. Significant Procedural Events

{¶ 17} In addition to the facts of the case, which are challenged by several of Timothy's assignments of error, there are a number of legal and procedural issues that arose from the trial and are now argued on appeal.

{¶ 18} Mid-trial, a juror revealed that she had been approached by Davis' son.  (Tr. Vol. III at 180-81.)  The juror was questioned by the trial judge and by Timothy's counsel, and she said that the acquaintance was casual (they had taken a class together in college) and that she could remain impartial.  (Tr. Vol. III at 180-83.)  The defense did not object to the juror remaining on the jury, and the juror was not excused.  *Id.*

{¶ 19} The defense requested instructions on lesser-included offenses as to each count.  (Tr. Vol. IV at 329-33.)  With respect to Count 2, felony murder, the defense requested an instruction on the lesser-included offense of involuntary manslaughter. *Id.* Count 2's felony-murder indictment was based on the allegation that Timothy caused death in the course of committing felonious assault on Davis.  (Indictment at 2.)  The defense reasoned that when what would be felonious assault is provoked, its elements change to those of aggravated assault, a fourth-degree felony; felony murder only applies when the predicate offense is a first or second-degree felony.  (Tr. Vol. IV at 257-58.)  As a result, if Timothy was found to have acted under provocation he could not be found guilty of felony murder but rather involuntary manslaughter, since that offense involves causing death in the commission of any felony, regardless of degree.  *Id.*  The trial court agreed to instruct the jury on the lesser-included offense of involuntary manslaughter.  (Tr. Vol. IV at 334.)  However, both the written instructions filed on the trial court's docket and the instructions orally given to the jury during trial defined involuntary manslaughter as,

No. 16AP-429

"causing the death of another as a proximate result of committing or attempting to commit a felonious assault."[2] (Tr. Vol. IV at 381.)

{¶ 20} The defense did not object to this iteration of its requested jury instruction, even though felonious assault is a second-degree felony. The defense also did not request an instruction on the affirmative defense of self-defense. Following the trial, on May 6, 2016, Timothy was found guilty only of the lesser-included offense of involuntary manslaughter and not guilty of all other primary and lesser offenses. (May 6, 2016 Verdict Forms.)

{¶ 21} The trial court held a sentencing hearing on May 16, 2016, ten days after the jury had reached its verdict and it was read in open court. At sentencing and over defense objection, the trial court permitted the prosecution to present evidence of Timothy's prior offense for the of purpose providing a basis for the trial court to find that he was a repeat violent offender as had been specified in the indictment as to Count 2, felony murder.[3] (May 6, 2016 Tr. Vol. V at 402-20.) The trial court found that Timothy was a repeat violent offender. (Tr. Vol. V at 440.) Then the court reasoned as follows:

> You had an opportunity on three occasions to walk away. The one that's most telling is right before the stabbing when you went to the corner of the building after being shooed off by the store owner, and you guys sat there. You both started to walk away, and you kind of brought him back, and then you waited and you waited and then she came around, and she came scurrying you away, trying to get you out of there.
>
> You can call it a punch or whatever, but she reminded me of Grandma chasing you down the street with a broom. She didn't do anything to hurt you, and then you coldly and calculatedly put it in her back. It was a cowardly way of going about it, and I still see that every time I think about this case.
>
> You know, you could have walked away. There is this waste of life on this one. This is one of those that a maximum sentence is appropriate, so it's 11 years plus the 10 for the [repeat-

---

[2] The written instructions differ only in that they capitalize "Felonious Assault." (May 5, 2016 Jury Instructions at 10.)

[3] Even though Timothy was convicted of the lesser-included offense of involuntary manslaughter and not felony murder, his conviction was one of a felony of the first degree. R.C. 2903.04(A) and (C). A repeat-violent-offender specification may be found for the commission of a first or second-degree felony that is an offense of violence and if the person previously was convicted of or pleaded guilty to such an offense. R.C. 2929.01(C).

No. 16AP-429

violent-offender specification]. This is one of the worst-case scenarios. I know it's not one of the standards, but it's consecutive by statute. 2929.14(C)(4), I mean, it gives me that right because it's a statutory mandate. I do have the ability to run it consecutive. I don't see any prejudice on there.

You know, I understand why the jury felt the way they did. I talked to them afterward; I made them available to you guys too.

And I know, [Defense Counsel], you heard them. They believed there was provocation there, but I still can't get it out of my head and justify not a maximum sentence on this because he coldly and calculatedly went at it.

And I know the jury found against that. I understand that, and I understand their reasoning. Okay? But I still can see the picture. I can still see the stabbing. It was unnecessary, and it was calculated, and a maximum sentence is the only justification here.

It's 21 years.

(Tr. Vol. V at 441-42.)

{¶ 22} Timothy now timely appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 23} Timothy asserts seven assignments of error for our review:

(1.) THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY ON INVOLUNTARY MANSLAUGHTER IN VIOLATION OF APPELLANT'S DUE PROCESS RIGHTS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

(2.) THE CONVICTION FOR INVOLUNTARY MANSLAUGHTER MUST BE REVERSED BECAUSE THE STATE FAILED TO PROVE ALL THE ELEMENTS BEYOND A REASONABLE DOUBT AS EVIDENCED BY THE JURY'S VERDICT AS TO VOLUNTARY MANSLAUGHTER CONTRARY TO THE DUE PROCESS CLAUSES OF THE U.S. AND OHIO CONSTITUTIONS.

(3.) THE TRIAL COURT ERRED IN ALLOWING THE STATE TO REOPEN ITS CASE- IN-CHIEF TO PRESENT EVIDENCE REGARDING THE REPEAT VIOLENT OFFENDER SPECIFICATION CONTRARY TO APPELLANT'S DOUBLE

No. 16AP-429

JEOPARDY RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.

(4.) THE TRIAL COURT ERRED AND IMPOSED A SENTENCE CLEARLY AND CONVINCINGLY CONTRARY TO LAW AND NOT SUPPORTED BY THE EVIDENCE, THUS CONSTITUTING AN ABUSE OF DISCRETION DEPRIVING APPELLANT OF DUE PROCESS CONTRARY TO THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND CORRESPONDING RIGHTS UNDER THE OHIO CONSTITUTION.

(5.) THE TRIAL COURT ERRED BY FAILING TO EXCUSE A JUROR WHO KNEW A FAMILY MEMBER OF THE VICTIM AND WHO MADE CONTACT WITH THAT FAMILY MEMBER DURING TRIAL CONTRARY TO APPELLANT'S CONSTITUTIONAL RIGHT TO A PANEL OF FAIR AND IMPARTIAL JURORS.

(6.) APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

(7.) THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION BASED ON INSUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

## III.  DISCUSSION

### C. First Assignment of Error—Whether the Trial Court Improperly Instructed the Jury on Involuntary Manslaughter

{¶ 24} In Ohio, one definition of murder is to "cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." R.C. 2903.02(B).  As indicted, Timothy was accused of committing murder by causing the death of Davis as a result of committing or attempting to commit the offense of felonious assault.  (Indictment at 2.) As potentially relevant to this case, felonious assault is defined as knowingly "[c]aus[ing]

No. 16AP-429

serious physical harm to another * * * [or] [c]aus[ing] or attempt[ing] to cause physical harm to another * * * by means of a deadly weapon."  R.C. 2903.11(A)(1) and (2). Felonious assault as potentially relevant in this case is a felony of the second degree.  R.C. 2903.11(D)(1)(a).

{¶ 25} Aggravated assault is defined essentially identically to felonious assault, except that it requires that the attacker have acted "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force."  R.C. 2903.12(A).  As applies in Timothy's case aggravated assault is a felony of the fourth degree.  R.C. 2903.12(B).  Thus aggravated assault (as opposed to felonious assault) cannot serve as the basis for a murder conviction under R.C. 2903.02(B) which requires a predicate violent felony of the first or second degree.

{¶ 26} The definition of involuntary manslaughter as applied in Timothy's case is "caus[ing] the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony."  R.C. 2903.04(A).  Hence aggravated assault (and, for that matter, any felony) could properly serve as a predicate felony for an involuntary manslaughter conviction.

{¶ 27} Despite the fact that aggravated assault was the proper predicate for involuntary manslaughter in this case, the trial court instructed the jury as follows:

> As you consider Count 2 of murder, you may also consider the lesser included offense of involuntary manslaughter. Involuntary manslaughter is causing the death of another as a proximate result of committing or attempting to commit a felonious assault.
>
> The offense of felonious assault has already been defined for you.

(Tr. Vol. IV at 381.)[4]  While causing a death through the commission or attempted commission of a felonious assault can be involuntary manslaughter (because causing death in the commission of any degree of felony is involuntary manslaughter) felonious assault can also be the predicate for felony murder (because felony murder includes violent felonies of the second degree, such as felonious assault).  *Compare* R.C.

---

[4] The written instructions differ in that they spell out 2 as "two" and capitalize "Felonious Assault" and "Murder." (Jury Instructions at 10.)

2903.02(B) *with* 2903.04(A). The jury instruction was misleading because it suggested to the jury that in order to convict Timothy of involuntary manslaughter, the jurors needed to find that he had committed a felonious assault even though an aggravated assault would have been a sufficient predicate offense.

{¶ 28} But we do not reverse in criminal cases based on errors that are harmless beyond a reasonable doubt. *See State v. DeMarco*, 31 Ohio St.3d 191, 195 (1987); *State v. Rahman*, 23 Ohio St.3d 146, 150 (1986). And despite requesting the proper instruction orally during trial, the defense did not object to the misleading instruction appearing in the written instructions or when the instruction was read to the jury when the court instructed it on deliberation. (Tr. Vol. III at 257-58; Tr. Vol. IV at 329-34, 381.) The failure to object to instructions typically results in waiver of the error and results in a plain error analysis on appeal. *See State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 60. The Supreme Court of Ohio has described plain-error analysis as follows:

> Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court. However, the accused bears the burden of proof to demonstrate plain error on the record, and must show "an error, i.e., a deviation from a legal rule" that constitutes "an 'obvious' defect in the trial proceedings," However, even if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same *deferential* standard for reviewing ineffective assistance of counsel claims.

(Emphasis sic; citations omitted.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22; *see also, e.g., State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, ¶ 13; *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 29} In this case the error proved to be harmless and not plain, because despite making it more difficult[5] for the jury to find Timothy guilty of the lesser-included offense of involuntary manslaughter, the jury was able to do so anyway. And the confusion

---

[5] The instruction improperly required proof of felonious assault when any felony would have been sufficient for the jury to find involuntary manslaughter.

created in the instruction's wording was essentially eliminated by another instruction the trial court gave as to Count 2:

> If you find that the State proved beyond a reasonable doubt that the defendant caused the death of Monica Davis as a proximate result of the defendant committing or attempting to commit felonious assault but you also find the defendant proved by a preponderance that he acted while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, then you must find the defendant guilty of involuntary manslaughter.

(Tr. Vol. IV at 382-83.) The fundamental difference between aggravated assault and felonious assault as relevant to this case is that the aggravated assault was essentially brought on by serious provocation occasioned by the victim. *Compare* R.C. 2903.11(A)(1) and (2) *with* 2903.12(A)(1) and (2). The trial court instructed the jury that if it found a provoked felonious assault (which is an aggravated assault) it should find Timothy guilty only of involuntary manslaughter. Any confusion engendered by the trial court's earlier misleading instruction was effectively reduced.

{¶ 30} Timothy's first assignment of error is overruled because any error here was not plain but harmless.

### D. Second Assignment of Error—Whether the Inconsistency in the Jury Verdict Shows that the State Failed to Prove the Elements of Involuntary Manslaughter Such that the Conviction Must be Reversed

{¶ 31} Timothy argues that the jury could not consistently have found him guilty of involuntary manslaughter while finding him not guilty of voluntary manslaughter. (Oller Brief at 23-27.) He posits that in his case both crimes involve causing the death of a person while provoked. *Id.* He argues that having acquitted him of causing death while provoked in Count 1 makes invalid convicting him of the same thing in Count 2. *Id.*

{¶ 32} However this argument ignores a crucial difference between voluntary and involuntary manslaughter concerning the offender's mental state relating to the results of his actions. In both voluntary and involuntary manslaughter (if predicated on an aggravated assault) a person acts "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C.

No. 16AP-429

2903.03(A); 2903.12(A); 2903.04(A). In both crimes, a death of another is caused. R.C. 2903.03(A); 2903.04(A). However, only in voluntary manslaughter does the offender "knowingly cause the death of another." R.C. 2903.03(A). By contrast, a person who commits involuntary manslaughter by causing death in the course of committing an aggravated assault only "knowingly" causes "serious physical harm" or "knowingly" "cause[s] or attempt[s] to cause physical harm to another * * * by means of a deadly weapon* * *." R.C. 2903.12(A)(1) and (2); *see also* R.C. 2903.04(A).

{¶ 33} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Thus, in a case of voluntary manslaughter, a "person is aware that the person's conduct will probably cause" death. *Id.*; R.C. 2903.03(A). Whereas, in a case of involuntary manslaughter predicated on aggravated assault, the person is "aware that the person's conduct will probably cause" "serious physical harm" or that a deadly weapon is used and "the person's conduct will probably cause" "physical harm." R.C. 2901.22(B); 2903.12(A)(1) and (2); 2903.04(A). It was thus consistent for the jury to have believed that Timothy did not knowingly cause Davis' death but did knowingly cause her serious physical harm or did knowingly use a deadly weapon to cause her physical harm. After all, Timothy testified that he did not intend to kill Davis but did stab her and was aware that stabbing her would cause serious damage to her. (Tr. Vol. III at 223, Tr. Vol. IV 293 and 317 ; State's Ex. F 0:58-1:10.)

{¶ 34} Even assuming arguendo some lingering incongruity in the verdicts, inconsistency in verdicts is not generally a reason to invalidate a verdict. *State v. Smith*, 10th Dist. No. 14AP-33, 2014-Ohio-5443, ¶ 23. As we have previously explained:

> Consistency between verdicts on several counts of an indictment is unnecessary where the defendant is convicted on one or some counts and acquitted on others; the conviction generally will be upheld irrespective of its rational incompatibility with the acquittal. *State v. Adams* (1978), 53 Ohio St.2d 223, 374 N.E.2d 137, vacated in part on other grounds, 439 U.S. 811, 58 L. Ed. 2d 103, 99 S. Ct. 69. Each count of a multi-count indictment is deemed distinct and independent of all other counts, and thus inconsistent verdicts on different counts do not justify overturning a verdict of guilt. *See State v. Hicks* (1989), 43 Ohio St.3d 72, 78, 538 N.E.2d 1030; *State v. Brown* (1984), 12 Ohio St.3d 147, 12

> Ohio B. 186, 465 N.E.2d 889, paragraph one of the syllabus; *State v. Washington* (1998), 126 Ohio App.3d 264, 276, 710 N.E.2d 307. "The sanctity of the jury verdict should be preserved and could not be upset by speculation or inquiry into such matters to resolve the inconsistency." *State v. Lovejoy* (1997), 79 Ohio St.3d 440, 444, 1997 Ohio 371, 683 N.E.2d 1112.

*State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, ¶ 15 (10th Dist.). Though inconsistency can indicate confusion or doubt on the part of jurors, it can also indicate compromise or mercy. *Id.* at ¶ 16.

{¶ 35} Timothy's second assignment of error is overruled.

### E. Third Assignment of Error—Whether the Trial Court Erred in Permitting the State to Present Evidence of Timothy's Prior Convictions for Purposes of Supporting a Repeat-Violent-Offender Specification After the State had Rested

{¶ 36} Timothy points out that the State rested its case on the fourth day of trial. (Oller Brief at 27-34; Tr. Vol. III at 267.) Notwithstanding that fact, after trial and prior to the imposition of sentence, the trial court permitted the prosecution to submit evidence regarding Timothy's criminal past in order to substantiate the repeat-violent-offender sentence enhancement pursuant to R.C. 2941.149. (Tr. Vol. V at 402-20, 440.) Timothy argues that this was improper because the State should have presented repeat-violent-offender evidence prior to resting and, in any event, the repeat-violent-offender specification disappeared when he was not convicted of either indicted count and instead convicted only of a lesser-included offense. (Oller Brief at 27-34.)

{¶ 37} The repeat-violent-offender statute itself provides that the specification finding is one for the judge to make, not the jury. R.C. 2941.149(B) ("The court shall determine the issue of whether an offender is a repeat violent offender."). This is a constitutionally appropriate finding for a judge (rather than a jury) to make, because the evidence supporting the repeat-violent-offender specification is information about the defendant's criminal history and, as the Ohio Supreme Court has explained, "[w]hen designating an offender as a 'repeat violent offender' * * * , a trial court does not violate the Sixth Amendment by considering relevant information about the offender's prior conviction that is part of the judicial record." *State v. Hunter*, 123 Ohio St.3d 164, 2009-Ohio-4147, paragraph two of the syllabus. Moreover, "the Sixth Amendment does not

limit a sentencing court's consideration to the *existence* of a prior conviction. On the contrary, the United States Supreme Court has held that courts may consider the information contained in court documents that are related to the prior conviction." (Emphasis sic.) *Id.* at ¶ 36, citing *Shepard v. United States*, 544 U.S. 13, 19-20 (2005).

{¶ 38} In short, evidence of the repeat-violent-offender specification is to be presented to the trial court outside the presence of the jury. Were the law instead as Timothy argues, a defendant could expect evidence of his violent criminal convictions to be placed before the jury during the State's case-in-chief (whether or not the defendant chose to testify) posing a great danger that the jury might draw the improper inference that the defendant committed the crime charged because he committed other violent offenses in the past. This would not be appropriate and indeed the Eighth District Court of Appeals recently held that submission of a repeat-violent-offender specification and evidence supporting it to a jury is error. *State v. Banks*, 8th Dist. No. 102360, 2015-Ohio-5413, ¶ 22-39. Additionally, Ohio evidence rules limit its admission. The relevancy of evidence of past and relatively recent crimes that are punishable by incarceration for more than one year is limited by Evid.R. 609(A) to the purposes of attacking the credibility of a witness and subject to time limits and post-rehabilitation actions such as pardon or expungement. Otherwise and under these circumstances, such evidence is admissible if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Also, evidence of a prior crime is admissible for the limited purpose of impeachment if the crime involves dishonesty or false statement, regardless of the level of punishment. Clearly, the statute for repeat violent offenders takes this into account, and we agree with the Eighth District on this point in *Banks* as well.

{¶ 39} Timothy presents neither caselaw nor reasoning to support his argument that the repeat-violent-offender specification ceased to exist when Timothy was found not guilty of the count to which it attached and was instead found guilty of a lesser-included offense of that count. The caselaw we have reviewed is to precisely the opposite effect. For example, by analogy, in *State v. Lytle*, 49 Ohio St.3d 154, 158 (1990), the Supreme Court held that "where a defendant is convicted of a * * * a lesser included offense of a felony of greater degree, and where the felony of greater degree is charged in the

indictment and is accompanied by a firearm specification, pursuant to R.C. 2941.141(A), the firearm specification applies to the lesser included offense."

{¶ 40} Timothy's third assignment of error is overruled.

## F. Fourth Assignment of Error—Whether the Trial Court Imposed a Sentence that was Contrary to Law

{¶ 41} "An appellate court will not reverse a trial court's sentencing decision unless the evidence is clear and convincing that either the record does not support the sentence or that the sentence is contrary to law." *State v. Poling*, 10th Dist. No. 14AP-666, 2015-Ohio-1236, ¶ 6, citing *State v. Chandler*, 10th Dist. No. 04AP-895, 2005-Ohio-1961, ¶ 10; *State v. Maxwell*, 10th Dist. No. 02AP-1271, 2004-Ohio-5660, ¶ 27; *State v. Comer*, 99 Ohio St.3d 463, 2003-Ohio-4165, ¶ 10; R.C. 2953.08(G)(2). "In determining whether a sentence is contrary to law, an appellate court reviews the record to determine whether the trial court considered the appropriate factors, made the required findings, gave the necessary reasons for its findings, and properly applied the statutory guidelines." *Poling* at ¶ 6, quoting *Chandler* at ¶ 10, citing *Maxwell* at ¶ 27.

{¶ 42} R.C. 2929.11 sets forth the overriding purposes of felony sentencing and then R.C. 2929.12 sets forth a considerable list of factors relating to seriousness of the offense and likelihood of recidivism that are to be considered in felony sentencing. While an explicit recitation of all of these factors and purposes is not required, they must be considered. *State v. Peterson*, 10th Dist. No. 12AP-646, 2013-Ohio-1807, ¶ 31. But R.C. 2929.14(B)(2)(e) does require that a trial court state the findings justifying the sentence imposed on a person pursuant to a repeat-violent-offender specification under R.C. 2929.14(B)(2)(a) and (b). In addition, R.C. 2953.08(G)(1) requires the trial court to "state the findings of the trier of fact required by division (B)(2)(e) of section 2929.14 of the Revised Code, relative to the imposition or modification of the sentence, and if the sentencing court failed to state the required findings on the record, the court hearing an appeal * * * shall remand the case to the sentencing court and instruct the sentencing court to state, on the record, the required findings."

{¶ 43} In this case, the trial court's entry contained the notation, "[t]he Court has considered the purposes and principles of sentencing set forth in R.C. 2929.11 and the factors set forth in R.C. 2929.12. In addition, the Court has weighed the factors as set forth in the applicable provisions of R.C. 2929.13 and R.C. 2929.14." (May 17, 2016 Jgmt.

No. 16AP-429

Entry at 1.) But the trial court failed to specifically address, either orally or in writing, the findings that led it to impose ten years on Timothy for being a repeat violent offender. R.C. 2929.14(B)(2)(a)(b) and (e). And though the trial court did address some of the R.C. 2929.12 factors when it considered, for example the harm to the victim, the degree of fault by the victim in inducing the offense, and the provocation under which the offender acted, those conclusions bear further examination in light of the jury verdict. R.C. 2929.12(B)(2); 2929.12(C)(1) and (2); Tr. Vol. V at 441-42.

{¶ 44} In order to find, as the jury did, that Timothy was guilty of involuntary manslaughter but not murder, the jury was instructed and had to have found by a preponderance of the evidence that Timothy acted "while under the influence of sudden passion or in a sudden fit of rage, either of which [wa]s brought on by serious provocation occasioned by the victim that [wa]s reasonably sufficient to incite the person into using deadly force." R.C. 2903.12(A). The trial court acknowledged on a number of occasions while sentencing Timothy that the jury had indeed made such a finding:

> You know, I understand why the jury felt the way they did. I talked to them afterward * * * .
>
> And I know, [Defense Counsel], you heard them. They believed there was provocation there * * * .

(Tr. Vol. V at 441-42.) However, the trial court said it had a "slightly different twist" and explained what it thought had occurred—that Timothy had "coldly and calculatedly" stabbed Davis in the back in a "cowardly" fashion. (Tr. Vol. V at 441-42.) The trial court then acknowledged that its own factfinding was in direct conflict with the jury's factfinding but said it was going to abide by its own factfinding for purposes of sentencing:

> And I know the jury found against that. I understand that, and I understand their reasoning. Okay? But I still can see the picture. I can still see the stabbing. It was unnecessary, and it was calculated, and a maximum sentence is the only justification here.

(Tr. Vol. V at 442.)

{¶ 45} Both the United States and Ohio Supreme Courts have explained that the historical role of the jury in finding facts necessary to convict or increase a sentence range

No. 16AP-429

is protected by the Sixth Amendment. *Alleyne v. United States*, ___ U.S. ___, 133 S. Ct. 2151 (2013) (holding the Sixth Amendment was violated where a jury found that the defendant had used or carried a weapon but the sentencing judge found that the defendant brandished the weapon and used its different finding to justify increasing the minimum sentence); *Oregon v. Ice*, 555 U.S. 160 (2009) (finding that the considerations necessary to imposing consecutive sentences, despite the effect of increasing the total, are the traditional and proper prerogative of the sentencing judge rather than the jury); *United States v. Booker*, 543 U.S. 220 (2005) (concluding that the Sixth Amendment was violated by a trial judge finding additional facts by a preponderance of the evidence in order to justify sentencing a defendant within the statutory maximum but beyond the otherwise-applicable guideline range); *Blakely v. Washington*, 542 U.S. 296 (2004) (finding a Sixth Amendment violation in a judge's factfinding that a defendant acted with "deliberate cruelty" in order to justify an above-range sentence); *Ring v. Arizona*, 536 U.S. 584 (2002) (finding a Sixth Amendment violation in a judge's fact-finding to support a sentence of death over the term of imprisonment otherwise to be imposed); *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (finding a Sixth Amendment violation in a judge's finding that a crime was racially motivated in order to increase the maximum sentence); *Hunter* at ¶ 34-39 (discussing *Apprendi* and progeny with approval but noting that a criminal's past record is not historically the sort of judicial factfinding that is offensive to the Sixth Amendment's jury trial guarantee); *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856[6] (finding a number of Ohio statutes impermissibly required judicial factfinding in violation of the Sixth Amendment).

{¶ 46} This Court has considered the *Apprendi* line of cases and held that they have little applicability to an indeterminate sentencing scheme like that which Ohio employs. *State v. Abdul-Mumin*, 10th Dist. No. 04AP-485, 2005-Ohio-522, ¶ 11-13. *Abdul-Mumin* decision quoted the *Blakely* case as justification for this view as follows:

> The Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate

---

[6] *Foster* was undermined in part by *Ice* and some of the statutes severed or ruled unconstitutional in *Foster* were then reenacted by the Ohio Legislature. *See State v. Hodge*, 128 Ohio St.3d 1, 2010-Ohio-6320; 2011 Am.Sub.H.B. No. 86; *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 3-4.

No. 16AP-429

> sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence--and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.

*Id.* at ¶ 11, quoting *Blakely* at 308-09. However, *Abdul-Mumin* was reversed by the Supreme Court in *In re Ohio Crim. Sentencing Statutes Cases*, 109 Ohio St.3d 313, 2006-Ohio-2109, ¶ 25.[7] Moreover, *Abdul-Mumin* concerned **additional** factual findings made by a trial judge in order to impose consecutive and greater-than-minimum sentences, not findings by the trial judge that directly contravened findings by the jury on the same factual issues. *Abdul-Mumin* at ¶ 4-5. Thus, the basic lesson of the *Apprendi* line of cases—that the province of the jury is not to be infringed on by the sentencing judge—remains a proper consideration in Ohio and this district.

{¶ 47} It is true, as the State points out, that some cases in Ohio have stated that "a sentencing judge may take into account facts introduced at trial relating to other charges, even ones of which the defendant has been acquitted." *State v. Wiles*, 59 Ohio St.3d 71, 78 (1991); *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 33. However, most cases stating this principle either predate or ignore *Apprendi* and its progeny. In this appellate district, for example, this principle finds root in *State v. Epley*, 10th Dist. No. 97APA11-1467 (Aug. 25, 1998), which cites only a pre-*Apprendi* United States Supreme Court case, *United States v. Watts*, 519 U.S. 148 (1997). It is thereafter carried forward in *Raver* (citing only pre-*Apprendi* cases) and *State v. Daniel*, which cites *Blakely* but declines to consider it based on the fact that the defendant waived any argument based on *Blakely*. *State v. Daniel*, 10th Dist. No. 05AP-564, 2006-Ohio-4627, ¶ 36, 41-42; *Raver*. In short, the continuing validity of this principle is open to some doubt.

{¶ 48} Yet we need not resolve that doubt in this case because, even were the principle sound in light of *Apprendi* and progeny, this Court, in *Daniel*, explained the

---

[7] Though some logical basis for the *Abdul-Mumin* decision was likely restored by the reenactment of the consecutive-sentencing provisions previously struck down in *Foster*. *See* 2011 Am.Sub.H.B. No. 86.

No. 16AP-429

rationale behind permitting the trial judge to take into account facts relating to acquitted charges:

> [F]or purposes of sentencing, proof by a preponderance of the evidence is required.
>
> Thus, even though the jury found that the state failed to prove beyond a reasonable doubt that defendant committed murder and that defendant carried a concealed weapon as alleged in the indictment, because a different burden of proof is required for sentencing purposes, the trial court was still free to reach a contrary conclusion for purpose of sentencing.

(Citations omitted.) *Daniel* at ¶ 29-30. This rationale is significant because in this case, proving provocation was Timothy's burden by a preponderance of the evidence. *State v. Strider-Williams*, 10th Dist. No. 10AP-334, 2010-Ohio-6179, ¶ 15; *see also State v. Rhodes*, 63 Ohio St.3d 613 (1992), syllabus. Thus when the jury found that Timothy had proved provocation it was finding provocation by the same standard applicable at sentencing. Hence, the rationale that could have allowed the sentencing judge to reach a different conclusion as enunciated in *Daniel*, cannot apply in this case.

{¶ 49} This is not a case in which a judge merely considered background facts about the defendant or the crime as has traditionally been the role of a sentencing judge. In this case, the trial court engaged in judicial factfinding about what occurred during the stabbing in direct contravention of the jury's findings on the same subjects, proved by the defendant by a preponderance of the evidence, in order to justify the trial court's sentence. In a similar circumstance, this Court has held that, "it constitutes an abuse of discretion for a trial court to impose a more severe sentence for a lesser charge of which the defendant was convicted because of the trial court's belief that the jury was mistaken in finding the defendant not guilty of a more serious offense." *Columbus v. Jones*, 39 Ohio App.3d 87, 89-90 (10th Dist.1987).[8]

{¶ 50} The situation in this case is also similar to the facts of *Alleyne*. In *Alleyne*, a defendant was convicted of robbery (among other offenses) and the "jury indicated on the verdict form that Alleyne had '[u]sed or carried a firearm during and in relation to a crime

---

[8] *Raver* concluded that *Jones* was likely incorrect based on *Epley* and *Wiles*. *Raver* at ¶ 33. However, as discussed above, *Apprendi* and cases that have followed, may create some doubt about *Raver* and its sources. Thus, we consider it appropriate, particularly on the facts of this case, to cite *Jones*.

of violence,' but did not indicate a finding that the firearm was '[b]randished.' " *Id.* at 2156. The trial court found, despite the jury's finding, that Alleyne had brandished the firearm and sentenced the defendant to seven years because the brandishing finding resulted in a higher minimum term of imprisonment. *Id.* The United States Supreme Court found that the trial judge had violated the Sixth Amendment:

> Because the finding of brandishing increased the penalty to which the defendant was subjected, it was an element, which had to be found by the jury beyond a reasonable doubt. The judge, rather than the jury, found brandishing, thus violating petitioner's Sixth Amendment rights.

*Id.* at 2163-64.

{¶ 51} In short, *Apprendi* and its successors are instructive on the basic principle that a trial judge must not "infringe[] on the province of the jury." *Abdul-Mumin* at ¶ 11, quoting *Blakely* at 308-09. The differing proof burden rationale by which courts in Ohio have sometimes permitted judges to consider facts relating to acquitted counts does not apply in this case. *See Daniel* at ¶ 29-30. Both *Alleyne* and *Jones* show that it is problematic (even if an offender's maximum exposure remains the same) to sentence to a greater than otherwise sentence based on factual findings considered and rejected by a jury. Additionally, a number of the factors in R.C. 2929.12 bear on the nature of the offense, the role of the victim in the offense, and whether the offender was provoked. *See* R.C. 2929.12(C)(1), (2) and (4). The trial court, in rejecting the facts found by the jury, would necessarily have come to different conclusions on these statutory factors than it should have done had it sentenced according to the jury's findings. The trial court erred when it rejected the jury's findings on whether there was provocation and instead substituting its own findings resulting in error in addressing the statutory factors.

{¶ 52} The State argues that Timothy failed to object to the sentence and raise these issues and thus we may only reverse if we find plain error. (State Brief at 25.) But at sentencing when the State argued that Timothy had calculated and instigated the incident defense counsel responded thus:

> [L]istening to [the prosecution], you'd think that Mr. Oller had been convicted of murder. I thought that Mr. Oller was convicted of involuntary manslaughter, which he was.

And I think that the jury clearly rejected the State's theory of the case. They clearly rejected it. And so when it comes to sentencing, the Court can't -- I mean, think the Court certainly has to take that into consideration that that's how the jury saw it. Twelve members of a jury who heard all the evidence in this case, that's what they found, and that flows into the Court's sentencing factors in terms of provocation and did the victim use that to facilitate the offense and things like that?

* * *

Again, I take exception with the State's contention that Mr. Oller picked the knife up and brought the knife with an intention to murder people. The jury clearly rejected that. Ms. Davis walks off screaming, and she could have kept on walking. She could have kept on walking. If she would have kept on walking, she would be alive today and would be with her family.

I take strong exception with the State's contention that Mr. Oller and his brother chose the place where the stabbing was going to happen. They didn't. Monica Davis chose that place. She chose that place. She walked back up and did that.

If Mr. Oller was intent on murdering and just going around stabbing people, he would have stabbed people right out in front of the store five, six minutes earlier. So I just -- you know, I just don't -- I strongly disagree with that. And I think, again, the jury's verdict was clearly along that line.

* * *

[W]e continue to object to the [repeat-violent-offender specification] being involved. We know what the Court has stated. We don't think this is a discretionary argument. We do not want the Court to impose it. The Court should impose a sentence in the sentencing range for a first degree felony.

(Tr. Vol. V at 435-38.) The matters we address were, therefore, preserved before the trial court and no plain error analysis on appeal is warranted.

{¶ 53} We sustain Timothy's fourth assignment of error and remand to the trial court for resentencing with instructions that the trial court must accept the finding of the jury that Timothy stabbed Davis while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force. We also

No. 16AP-429

instruct, as is our statutory duty, that if the trial court imposes an additional period of imprisonment based on the repeat-violent-offender specification, that it must "state the findings of the trier of fact required by division (B)(2)(e) of section 2929.14 of the Revised Code, relative to the imposition or modification of the sentence."  R.C. 2953.08(G)(1); 2929.14(B)(2)(e).

### G. Fifth Assignment of Error—Whether the Trial Court Plainly Erred in Failing to Excuse a Juror to whose Continued Presence Neither Side Objected, Even After the Juror had Contact with the Victim's Son

{¶ 54} The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."  Sixth Amendment to the U.S. Constitution.  This right is " 'fundamental to the American scheme of justice,' and therefore applicable in state proceedings." *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993), quoting *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).  However, a juror is not partial or biased if "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

{¶ 55} In this case, on receiving information that a juror had an interaction with the victim's son, the trial court held a brief hearing as follows:

> JUROR NO. 4: So I was coming back from Chipotle.  I was on my phone, and a guy was sitting on the steps. He was saying something to me.  I ignored him, and he kept trying to say something to me, so I'm, like, what does he want?
>
> So as I got closer, I recognized him because I went to school with him.  Last year we took a college class.  And then I said, "Hey. How are you doing? What are you doing here?"
>
> He said, "I'm here for the trial of my mom, Monica Davis."
>
> And so I'm just, like, "Okay."
>
> And he's, like, "I didn't want to distract you because I seen that you were on the jury."
>
> THE COURT: So he had seen you in the jury box?
>
> JUROR NO. 4: Yes.
>
> THE COURT: Did you have your badge on?

No. 16AP-429

JUROR NO. 4: Yes, I had it on.

THE COURT: Kind of buried behind that?

JUROR NO. 4: Like this. (Indicating.)

THE COURT: Is this going to influence you in any way? Do you feel intimidated? Is there anything that bothers you about it other than it happened?

JUROR NO. 4: No. I didn't know him personally, other than we took a college class, but I just wanted to say that because I didn't want to get in trouble for him seeing me.

* * *

[Defense Counsel]: Ma'am, is there anything about the relationship that you have with this gentleman that is going to create problems in terms of your impartiality or your ability to serve?

JUROR NO. 4: No, sir. No.

[Defense Counsel]: Again, this wasn't an intimidating or threatening type of approach?

JUROR NO. 4: No, sir.

THE COURT: You felt a little uncomfortable because he mentioned the victim's name; correct?

JUROR NO. 4: I did because I didn't see it coming. I just saw him. He said, "How are you doing? Are you still in school? I'm in school still." It was like that. And once he hit me with that, it was, like, you know, "I'm sorry." I didn't know that when I came in here. I didn't look that way.

* * *

THE COURT: So you feel comfortable going forward?

JUROR NO. 4: I do.

(Tr. Vol. II at 180-83.) The defense did not object to the juror remaining on the jury and the juror was not excused.

{¶ 56} The Supreme Court of Ohio has considered a similar scenario and ruled that no prejudice was shown:

No. 16AP-429

> [The defendant] contends that his counsel should have challenged juror No. 7 for cause because the juror knew the victim. Juror No. 7 remembered [the victim] as an entertainer who had been known locally when the juror was in her teens. However, juror No. 7 "didn't know him personally." [The victim] was a "friend of a friend of a friend." The juror's interaction with [the victim] was limited to saying "Hello" or "[H]ow you doing?" About three years before the trial, [the victim] had sung at the wedding of the juror's brother, but the juror had been ill and did not remember him well. Juror No. 7 stated that her acquaintance with [the victim] would not affect her ability to be fair and impartial.

> "There is no constitutional prohibition against jurors simply knowing the parties involved or having knowledge of the case." *McQueen v. Scroggy* (C.A.6, 1996), 99 F.3d 1302, 1320. Juror No. 7 testified that her slight acquaintance with [the victim] would not affect her impartiality, and her voir dire gives no reason to doubt this. The relationship was distant and casual, not "close and ongoing" as in *Wolfe v. Brigano* (C.A.6, 2000), 232 F.3d 499, 502. *See Miller v. Francis* (C.A.6, 2001), 269 F.3d 609, 618 (distinguishing *Wolfe*).

*State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 207-08. We acknowledge that this case may raise greater concern than *Hale* because the juror actually had contact with the victim's family during the trial, but the concern in *Hale* is more grave because, in *Hale*, the juror knew the actual victim, not merely a family member of the victim. On balance, we view the severity of the potential bias here is analogous to *Hale* and thus do not find prejudice or plain error in the trial court allowing the juror to remain on the jury in the absence of an objection from the defense.

{¶ 57} Timothy's fifth assignment of error is overruled.

## H. Sixth Assignment of Error—Ineffective Assistance of Counsel

{¶ 58} Ineffective assistance of counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. (" '[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in

No. 16AP-429

the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.' ").

### 1. Failure to Object to Jury Instructions

{¶ 59} "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. As we have already discussed above, the confusing portion of the jury instructions was, at most, harmless error. *See supra* ¶ 24-28. There is no probability whatsoever, to say nothing of "a reasonable probability" that the outcome would have been different (in a way that benefitted Timothy) had defense counsel objected and sought clarification of the jury instructions.

### 2. Failure to Request Dismissal of a Juror who Knew the Victim's Son

{¶ 60} As noted, defense counsel exercised the opportunity to question the juror and was aided by the trial court in that questioning. *See supra* ¶ 54-56. Defense counsel apparently did not sense anything amiss in the juror's demeanor as she answered the questions. The answers themselves suggest, if taken at face value, that the juror could continue to be impartial. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). Whether the juror seemed honest and favorable to the defendant, notwithstanding the attenuated connection to the victim, is a quintessential strategic judgment call by the defense attorney, and we will not second-guess counsel's in-person judgment of the juror in the absence of some other evidence that counsel's judgment was flawed or unreasonable. *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006), citing *State v. Campbell*, 69 Ohio St.3d 38, 52-53 (1994) (explaining that a strategic failure to object is not ineffective assistance even where there is a legitimate legal ground for objecting).

### 3. Failure to Request a Self-Defense or Defense-of-Another Instruction

{¶ 61} While the State bears the burden of proving the elements of a crime beyond a reasonable doubt, a defendant asserting the affirmative defense of self-defense must prove each element of the defense by a preponderance of the evidence. R.C. 2901.05(A);

*State v. Martin*, 21 Ohio St.3d 91, 94 (1986). To establish self-defense, a defendant must prove: (1) he was not at fault in creating the situation giving rise to the affray, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of escape from such danger was the use of such force, and (3) he must not have violated any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. In defending oneself, a person may only use as much force as is reasonably necessary to repel the attack. *State v. Jones*, 10th Dist. No. 14AP-796, 2015-Ohio-2357, ¶ 27, citing *State v. Harrison*, 10th Dist. No. 06AP-827, 2007-Ohio-2872, ¶ 25. Defense of another is similar except, instead of defending ones' self, it is another who is in danger and the defending person stands in the shoes of the defended with regard to the elements of self-defense. *State v. Moss*, 10th Dist. No. 05AP-610, 2006-Ohio-1647, ¶ 13, citing *State v. Wenger*, 58 Ohio St.2d 336, 340 (1979); *State v. Williford*, 49 Ohio St.3d 247, 250 (1990).

{¶ 62} Here, based on the evidence presented at trial, it was plausible to conclude that Timothy and Robert did not create the situation giving rise to the affray. Until the instant of the actual stabbing, at no point on the video did Timothy or Robert appear to be an aggressor. *Robbins* at paragraph two of the syllabus. But based on the evidence presented at trial, proof of the other elements seems to have been firmly beyond reach. The Ollers could not have reasonably feared imminent danger of death or great bodily harm from the 43-year-old unarmed, intoxicated, and not especially fit woman who was wildly attempting to punch them. (Tr. Vol. IV at 318-19; State's Ex. A. at 53:54-54:23.) Timothy and his brother were not restrained in any manner nor backed into a corner such that they could not easily run away from their overweight assailant. (State's Ex. A at 53:54-54:13.) And, had Timothy felt the need to use force in self-defense or defense of his brother, there is no reason evident as to why that force needed to be deadly. Davis punched each of them. They could have fled or punched back. The choice not to argue self-defense or defense of another and instead focus on provocation was strategically reasonable "sound trial strategy." *Strickland* at 689. Arguing self-defense or defense of another on the evidence that was presented at trial could reasonably have been futile and it is not generally ineffective assistance to fail to engage in futile tactics. *State v. Ealy*, 10th Dist. No. 11AP-750, 2012-Ohio-3336, ¶ 17; *State v. Bean*, 10th Dist. No. 06AP-208, 2006-Ohio-6745, ¶ 18.

No. 16AP-429

### 4. Cumulative Effect of the Errors

{¶ 63} Having found no incidents suggestive of ineffective assistance of counsel we also do not find any cumulative effects of the same.

## I. Seventh Assignment of Error—Manifest Weight and Sufficiency of the Evidence

{¶ 64} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 65} Sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary* 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 66} By contrast:

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict * * * . Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594. In manifest weight analysis "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida.*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all

reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 67} As this crime is on video and the defense stipulated to the identities of the persons involved, the evidence in this case is not insufficient or manifestly against conviction in any traditional sense. (Tr. Vol. II at 63-64; State's Ex. A.) Rather, as he did in his second assignment of error, Timothy argues that the conviction is insufficiently supported and against the manifest weight of the evidence because the jury found him not guilty of the lesser-included offense of voluntary manslaughter. (Oller Brief at 54-57.) That is, Timothy argues that the "not guilty" verdict on voluntary manslaughter shows that the evidence was not sufficient or weighty enough to convict on involuntary manslaughter since he asserts those offenses to be essentially the same in this case. As we previously discussed, this argument ignores that voluntary manslaughter requires proof that the defendant "knowingly cause[d] [] death" but involuntary manslaughter (when accomplished by aggravated assault) only requires that the defendant have "knowingly" caused "serious physical harm" or "knowingly" used a deadly weapon to cause "physical harm" with the result that death occurred. R.C. 2903.03(A); 2903.12(A)(1) and(2); 2903.04(A).

{¶ 68} For the same reasons we overruled Timothy's second assignment of error, we overrule his seventh assignment of error.

## IV. CONCLUSION

{¶ 69} We overrule Timothy's first, second, third, fifth, sixth, and seventh assignments of error. But because we find that the trial court did not state the necessary findings with regard to the sentence imposed on the repeat-violent-offender specification and because the trial court erred in substituting its own factfinding for the facts found by the jury and proved by Timothy by a preponderance of the evidence, we sustain Timothy's fourth assignment of error.

{¶ 70} This case is remanded to the Franklin County Court of Common Pleas for a new sentencing with instructions that the trial court must accept the finding of the jury that Timothy stabbed Davis while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that

No. 16AP-429

is reasonably sufficient to incite the person into using deadly force. We also instruct the trial court that, if it imposes an additional period of imprisonment based on the repeat-violent-offender specification, it must "state the findings of the trier of fact required by division (B)(2)(e) of section 2929.14 of the Revised Code, relative to the imposition or modification of the sentence." R.C. 2953.08(G)(1); 2929.14(B)(2)(e).

*Judgment reversed in part and remanded with instructions for resentencing.*

TYACK, P.J., and KLATT, J., concur.

KLATT, J., concurring.

{¶ 71} I concur in the majority decision's resolution of appellant's seven assignments of error. I write separately solely to address appellant's fourth assignment of error because I would sustain the assignment of error on a more narrow basis than expressed in the majority decision.

{¶ 72} As noted by the majority, the jury found by a preponderance of the evidence that appellant proved provocation. However, the trial court explicitly rejected the jury's provocation finding when it imposed sentence even though the trial court also applied a preponderance of the evidence standard. *State v. Casalicchio*, 58 Ohio St.3d 178, 181 (1991), *rehearing denied*, 60 Ohio St.3d 705 (for purposes of sentencing, proof by a preponderance of the evidence is required). The trial court erred when it rejected the jury's finding under these circumstances.

{¶ 73} A trial court imposing a sentence must accept a jury's finding that the defendant acted under the influence of sudden passion or a sudden fit of rage. It may not disregard such a finding and impose a sentence based on its own view of the evidence. To do so improperly usurps the jury's role in our criminal justice system. *State v. Sprowls*, 11th Dist. No. 2003-L-056, 2004-Ohio-6328, ¶ 59. Consequently, I would sustain appellant's fourth assignment of error on this narrow basis.